JACKSON, *ex dem.* BELDEN and others, *against* THOMAS.

THIS was an action of ejectment, commenced in *August,* 1817, for the recovery of lot No. 41., in the second division of the *Minisink* patent, in the town of *Mamakating*, in the county of *Sullivan.* The cause was tried before Mr. Justice *Spencer*, at the *Sullivan* circuit, in *September*, 1817.

The plaintiff claimed title to the premises in question, under the patent granted to *Ebenezer Willson, Lancaster Symms,* and others, commonly called the *Minisink* patent. The patent was dated the 28th of *August*, 1704, and the lands granted were described therein, as " lying and being in *Orange* and *Ulster* counties, beginning at a certain place in *Ulster* county, aforesaid, called *Hunting House,* or *Yaagh House,* lying to the north east of the land, called *Baske's* land; thence to run west by north, until it meet with the *Fishkill* or main branch of the *Delaware* river; thence to run southerly to the south end of *Great Minisink Island ;* thence due south to the land lately granted to *John Bridges* and company, and so along that patent, as it runs northward, and the patent of Captain *John Evans,* and thence to the place it first began ?" The patent granted one three-and-twentieth part of the land described, to *Lancaster Symms* and his heirs ; and the lessors of the plaintiff deduced a regular title, principally by descent, from *Lancaster Symms.* A partition of the patent was made by commissioners, under the colonial act of the 8th of *January,* 1762, entitled, " *an act for the more effectual collecting of his majesty's quit rents in the colony of New-York, and for partition of lands in order thereto ;*" and lot No. 41., in the second division of the patent, was allotted to *Lancaster Symms* in severalty. The defendant was in possession of the west part of this lot.

It was contended, on the part of the defendant, that the premises were not within the *Minisink* patent, and for this purpose the following patents were produced in evidence :

1. The patent to Captain *John Evans,* dated *September*

The western boundary of the *Minisink* patent is formed by the eastern boundaries of *Wawayanda* patent, and the patent to *Evans,* which make one continued unbroken line, and is situated at the foot of the east side of the *Shawangunk* mountains.

A person who enters without claim or colour of title, is deemed to be in possession, in subservience to the legal owner, and no length of time, unaccompanied with any change in the character of his possession, will render it adverse; but if he afterwards obtains a good or colourable title, from that period an adverse possession commences.

20th, 1694, for a tract of land, described as follows : " All that tract and parcel of land lying and being situate upon the west side of *Hudson's* river, beginning from the south side of the land called the *Palts*, now inhabited by *Frenchmen*, and extending thence southerly along the said *Hudson's* river to the land belonging to the *Indians* at the *Murderer's Kill*; and extending westward to the foot of the high hills, *Pitkiskakee*, and *Aiaskawasting*, and thence extending southwesterly, all along the said hills and the river called *Peakadasink*, to a water pond lying upon the said hills."

2. The patent to Doctor *John Bridges & Co.* dated *April* 29, 1703, for " all those tracts or parcels of vacant and unappropriated land in the county of *Orange*, called or known by the name of *Wawayanda*, and of some other small tracts or parcels of like land there, being bounded on the eastward by the high hills of the highlands, and the patent lands of Captain *John Evans*, on the north, by the division line of the said county of *Orange* and *Ulster*, on the westward by the high hills to the eastward of *Minisink*, and on the south by the division line of the provinces of *New-York*, and *East New-Jersey*."

3. A patent to *Return Holcomb*, dated *January* 22, 1790, for " all that certain tract of land, situate in the county of *Ulster*, in the town of *Mamakating*, beginning at the most westerly corner of the tract of land laid out for *Ebenezer Holcomb*, and running thence south, forty-one degrees and twenty minutes, west, forty chains, then south, forty-six degrees and thirty minutes, east, fifty chains and fifty links, to the northwest bounds of a tract granted to *Archibald M'Bride* and others, then along the same north forty-one degrees and twenty minutes, east, forty chains, to the said tract laid out for *Ebenezer Holcomb*, and then along the same, north forty-six degrees and thirty minutes, west, to the place of beginning, containing two hundred acres." This patent covered the west part of the premises in question.

4. A patent to *James White* and others, dated *May* 18, 1761, covering the residue of the premises in question.

All the land covered by this patent was relinquished, on the trial, by the plaintiff.

*John Willson,* a witness on the part of the defendant, testified, that the *Holcomb* patent lies on the top of *Shawangunk* mountain, and includes the westerly part of the premises in question, and that the easterly part was contained within the bounds of the patent to *White* and others : that the *Yaagh* house is in *Mamakating* hollow, near the church : that a line running the nearest course from the *Yaagh* house to the east foot of the mountain, would leave the premises in question on the south side of it; and that the *Wawayanda* patent is bounded on the west, by the east foot of the *Shawangunk* mountain. That the witness, at the request of the defendant, had been to a pond lying on *Shawangunk,* which he was informed was called *Merelange :* that he found the pond on the line between Nos. 8 and 9 of the sixth division of the *Minisink* patent, sixty chains west of the east foot of the mountains; and that the outlet from *Merelange* pond was south east.

*Samuel Gunsalus,* another witness for the defendant, testified, that he was more than eighty-three years of age : that the pond was first shown to him by the *Indians,* who called it the *Merelange,* or *Canetotheman :* that he well knows the *Shawangunk* mountain, and *Mamakating* hollow ; and that the farm, called the *Martin* farm, lies on the north part of the expense lot, No. 3. of the *Minisink* patent, east of the *Yaagh* house, and has been held and improved under the *Minisink* patent, for more than fifty years.

*Samuel Bodle,* another witness for the defendant, testified that the pond was never known as a corner of any patent; that it lies near *West Falls* in *Minisink :* that the east face of the mountain was all cultivated and claimed, and held under the *Minisink* patent : that he never heard it disputed that the mountain was a part of the *Minisink* patent ; and that the lands in *Mamakating* hollow, west of *Shawangunk* mountain, have always been reputed to be held under the *Minisink* patent.

*Timothy Doolittle,* also a witness for the defendant, testified, that at the time the *Holcomb* patent was granted, and a number of years before 1790, *Holcomb* lived on part of

the land covered by the patent, but not on the premises in question : that he sold to *Ebenezer Holcomb*, jun. who remained in possession till about six years ago : that the defendant was in possession of the premises about twenty or twenty-five years, and that he bought the possession : that several years ago, one *Schoonmaker* came on the mountain, and was about obtaining a patent for the same, as vacant land, the occupants being in possession without title, and it was then agreed that *Schoonmaker* should procure patents to the occupants, for the lands possessed by them, and that he should have the rest : that at the time the patent was granted to *Holcomb*, the defendant was not in possession of the premises in question : that the west part of the premises in question, which is not covered by *White's* patent, has, ever since the patent to *Holcomb*, been held by *Holcomb*, and those who have purchased of him ; and that the defendant is in possession, claiming title under that patent.

*William W. Sacket*, a surveyor, was then called by the plaintiff, and testified, that the north line of the *Wawayanda* patent is a considerable distance north of the land mentioned by *Willson*, and the other witnesses ; that the line called the new north west line, run by Mr. *Colden*, would strike No. 33. in the second division of *Minisink* patent ; that No. 1. and No. 2. of the sixth division of that patent, were purchased of the *Minisink* proprietors, and were held under that patent ; that all that part of the sixth division lying north of the present established line of the state of *New-Jersey*, has always been reported to belong to the same patent, since the establishment of that line ; that he knows the line established between the *Hardenbergh* and *Minisink* patents, from the *Yaagh* house easterly, which line was settled by the *Hardenbergh* proprietors, as the south line of great lot No. 27. ; that he had always understood that the lands south of that line were held under the *Minisink* patent, and that *Mamakating* hollow, south of that line, had been possessed for a great many years under the *Minisink* proprietors ; that lot No. 46. in the first division of that patent, was sold many years ago to the present occupants, under the *Minisink* title ; that a line from the pond mentioned by *Willson* to the *Yaagh* house, would run across the

sixth division, and No. 46. of the first division, and through *Mamakating* hollow, and cut off the principal part of the *Martin* farm; and that the second and sixth divisions are located on the east face of the mountain.

The plaintiff then produced in evidence, an exemplification of the *Hardenbergh* patent, dated the 20th of *April*, 1708, the boundaries of which are as follows: " a certain tract of vacant and unappropriated land, situate in the counties of *Ulster* and *Albany*, beginning at the *Sandbergh* or hills, at the north east corner of the land granted to *Ebenezer Willson*, *Derick Vanderbergh*, &c. at *Minisink*, so running all along their line, northwesterly, as the said line runs, to the *Fishkill*, or river, and so to the head thereof, including the same ; thence on a direct line to the head of a certain small river, commonly known by the name of *Cartwright's* kill, and so by the northerly side of the said kill or river, to the northernmost bounds of *Kingstown*, on the said kill or river; thence by the bounds of *Kingstown*, *Hurley*, *Marbletown*, *Rochester*, and other patented lands to the southward thereof, to the *Sandbergh*, the place where it first began."

The defendant then produced in evidence, an office copy of the patent granted to Col. *Henry Beekman* and others, commonly called the *Rochester* patent, dated the 25th of *June*, 1703, the boundaries of which are as follows : " all that tract or parcel of land, lying and being in the county of *Ulster* aforesaid, and beginning at the south bounds of the land now in the possession of *John Van Camp*, from thence running with a south east line, to the land of Capt. *John Evans*, and so along the north west bounds of the said Capt. *Evans*, his land, till you come over against the *Sand* hills ; from thence with a northwest line to the great mountains, commonly called the *Blue* hills ; thence north east, something northerly, along the said hills to the bounds of *Marbletown*, and from thence along the bounds of *Marbletown*, to the place where first began."

A verdict was taken for the plaintiff, subject to the opinion of the Court on the above case.

*L. Billings*, for the plaintiff.

*Baker* and *Betts*, contra.

The principal question related to the location of the pre-
mises ; and as the arguments would not be understood with
a reference to the map, it is not thought necessary to state
them.

SPENCER, Ch. J. delivered the opinion of the Court.
Two questions have been made on the argument : 1. Are
the premises included in the *Minisink* patent? 2. Has
there been an adverse possession for a sufficient length of
time to bar the plaintiff's right of entry?

The premises in dispute are part of lot No. 41. lying near
the top of (and a little east thereof) the *Shawangunk* moun-
tain, and west of the foot of the mountain. It appeared
to be conceded, that if the *Minisink* patent ran along the
foot of the mountain on the east side, so far north as that a
west line was to be run to the *Hunting* house, or *Yaagh*
house, then lot No. 41. fell within that patent, and the les-
sors of the plaintiff had deduced a title to it.

The last or closing line in the *Minisink* patent, is the only
one in dispute, for it is conceded, that the place of begin-
ning is at the *Yaagh* house ; and that is a notorious and un-
disputed monument. The previous boundaries and courses
of the patent, were east of the *Shawangunk* mountain, and
upon the line of the patent granted to *John Bridges & Co.*
and then the course is thus : " and so along that patent
(*Bridges's* patent,) as it runs northward, and the patent of
Capt. *John Evans*, and thence to the place of beginning."
Now, it is clear from the evidence in the case, that the pa-
tents to *Bridges & Co.* and Capt. *Evans*, presented one con-
tinued unbroken line, and that *Evans's* patent ran along the
foot of the *Shawangunk* mountain on the east side of it, op-
posite to a line due west to the *Yaagh* house. This was the
construction of that patent adopted by this Court in *Jackson*
v. *France*, (10 *Johns. Rep.* 434.) and it is supported by the
evidence in the cause. The *Minisink* patent is inexplicit
as to the precise point on the line of *Evans's* patent, from
which the closing line to the place of beginning is to be
run ; but the facts in the case decide that.

Before the revolutionary war, the patent of *Minisink* was
divided by Commissioners, appointed in pursuance of the
colonial act of the 8th of *January*, 1762, (2d vol. of *Smith's*
edition of laws, 237.) and the 9th section of that act requir-
ed the outlines of the patent to be surveyed by the surveyor
general; after this length of time we must intend that
this direction was fulfilled.    At this remote period, the
act of a public officer in ascertaining the boundaries of a
patent, under the direction of the legislature, is entitled to
high consideration, as evidence of the sense of government;
not that such an act would control, in cases where the boun-
daries were certain and explicit; but in cases where they
are vague and uncertain, as it must be confessed they are, in
regard to *Evans's* patent, the acts of the surveyor general,
adopted by the Commissioners, and acted upon by the pro-
prietors, are of very high authority.    The situation of the
places referred to in the patent, and the lines run, were then
within the knowledge of many persons; and we cannot ex-
pect, at this late day, the same light which the officers of go-
vernment then had.    Independently of this, the evidence
shows, that lots No. 1. and 2. in the 6th division of the
*Minisink* patent, were purchased of the *Minisink* proprie-
tors, and are held under that patent; and those lots, on the
east, run down to the foot of the *Shawangunk* mountain.    It
is proved, that the proprietors of the *Minisink* and *Harden-
bergh* patents, have a settled and established boundary be-
tween them, and that the premises in question lie south of
that line; and that, in general, the lands south of that line
have always been held under the *Minisink* patent; that the
lands in *Mamakating* hollow, south of that line, especially,
have been held, for a great number of years, under the *Mini-
sink* patent; and, particularly, lot No. 46. in the first division
of the *Minisink* patent, lying north of the premises in dispute,
and east of the top of the *Shawangunk* mountain, is and has
been, for many years, held under the *Minisink* patent.

These facts, in my opinion, settle the question, and we
must pronounce the premises in dispute to lie within the
*Minisink* patent, and, therefore, as belonging to the lessors of
the plaintiff.

The defence set up was, that the defendant held adversely

to the plaintiffs, and had so held possession, under colour of title, for more than twenty years prior to the commencement of this suit.

The defendant gave in evidence, two patents, the one to *James White* and others, dated the 18th day of *May*, 1761, and the other to *Return Holcomb*, dated the 22d of *January*, 1790; and it was then proved, that the patent to *White* covered the easterly part of the premises in question, and the patent to *Holcomb*, the westerly part thereof, and thereupon the plaintiff relinquished any claim to that part of the premises included in the patent to *White*.

It was then proved by a witness, that he knew the *Holcomb* patent, and that at the time it was granted, and a number of years before, *Holcomb* lived on part of the land covered by the patent, *but not on the premises in question.* That several years ago, one *Schoonmaker* was about obtaining a patent for the lands on the mountain, as vacant lands, at which time the possessors had no title; and it was then agreed that *Schoonmaker* should procure patents to the occupants for the lands possessed by them, and that he should have the rest. That, at the time the patent was granted to *Holcomb*, the defendant was not in possession of the premises; that the west part of the premises not covered by *White's* patent, *have, ever since the patent to Holcomb, been held by Holcomb, and those who have* purchased of him, and that the defendant is in possession, claiming title under that patent.

It appears to me, that an adverse possession is abundantly made out. When the patent was granted to *Holcomb*, he did not live on the premises in question; but ever since the granting of the patent, that part of the premises not included in *White's* patent, have been held by *Holcomb*, and those who have purchased of him; and the fact is proved, that the defendant *is in possession, claiming title under Holcomb's patent*, and he certainly entered into possession since the granting of the patent to *Holcomb*, for his possession has been for twenty, or twenty-five years. The objection to the adverse nature of the possession is, that there is no privity between the defendant and *Holcomb*, and that the defendant's possession, in its origin, was not adverse.

The first objection is not sustained by the facts, for the proof is, that the defendant is in possession, claiming title under *Holcomb's* patent, and that the premises not included in *White's* patent, have, ever since the patent to *Holcomb*, been held by him, and those who have purchased of him. The evidence was not objected to at the trial, nor were the deeds from *Holcomb* called for, or insisted upon, as the best evidence of the facts; we must, therefore, consider these facts as well proved.

If the defendant was not in possession when *Holcomb's* patent issued, and the case shows he was not, and if these premises have been held, ever since that patent issued, by *Holcomb*, and those claiming under him, then the defendant's possession was, in its inception, adverse.

The principle, however, that possession must, in its inception, be adverse, and continue so, is not well understood. In those cases in which that observation occurs, nothing had happened to change the character of the first possession, and that was considered as denoting *quo animo* the possession was held after the first entry.

If one enter on land without any title or claim, or colour of title, the law adjudges the possession to be in subservience to the legal owner, and no length of possession will render the holding adverse to the title of the owner; but if a man enters on land, without claim or colour of title, and no privity exists between him and the real owner, and such person, afterwards, acquires what he considers a good title, from that moment his possession becomes adverse. I am not sensible that the Court have ever held a contrary doctrine.

In the present case, even *Holcomb* was not in possession of these premises when his patent issued, though he entered immediately after. It appears to me, that an adverse possession for a sufficient length of time to bar the plaintiff's right of entry, is clearly established by the evidence.

Judgment for the defendant.

N. B. In the case of *Jackson*, ex dem. *Belden* and others, v. *Daniel Godfrey*, jun. the same judgment was rendered.